**BAYOU PIPELINE CORPORATION,
Appellant,**

v.

**RAILROAD COMMISSION of Texas and
Walter Van Norman, Appellees.**

No. B–7029.

Supreme Court of Texas.

Jan. 25, 1978.

Hart & Hart, James P. Hart and Joseph H. Hart, Austin, Sanford W. Likover, Bellaire, for appellant.

John L. Hill, Atty. Gen., Marvin Sentell, Asst. Atty. Gen., Scott & Douglas, James N. Cowden, Austin, for appellees.

GREENHILL, Chief Justice.

Bayou Pipeline Corporation brings this direct appeal from a judgment of the 53rd District Court of Travis County. As plaintiff in the district court, Bayou Pipeline Corporation [hereinafter Bayou] sought a permanent injunction against the enforcement of a Railroad Commission order dated November 23, 1976. Briefly summarized, this order directed Bayou to transport natural gas belonging to Walter Van Norman at a rate of 4.07 cents per thousand cubic feet [mcf]. The district court denied the injunction and declared that the Railroad Commission's order was in all things valid. Invoking this court's jurisdiction under Arti-

cle 1738a[1] and under Rule 499a, Texas Rules of Civil Procedure, Bayou presents two questions of law for our determination: first, whether the Railroad Commission had authority to fix transportation rates to be charged by Bayou, and second, whether the rate established by the Commission was determined by the correct standard. We hold for the appellees, the Railroad Commission and Walter Van Norman, on both points; and we affirm the judgment of the district court.

The present dispute had its beginnings with a mineral lease assignment from Walter Van Norman to Bertman Gas & Oil Corporation [hereinafter "Bertman"]. In 1971, Van Norman assigned to Bertman a working interest in the Gephardt, *et al*, Lease in Jefferson County, Texas. Van Norman reserved, in kind, a 22½ percent of ⅝ths overriding royalty interest in the oil and gas produced from the lease. Under the terms of the assignment, Bertman assumed the obligation of delivering Van Norman's share of the oil and gas production to market along with Bertman's share. Since 1971, all of Van Norman's and Bertman's production from the Gephardt Lease has been transported from the wellhead by Bayou Pipeline Corporation. Bayou, a wholly owned subsidiary of Bertman, owns and operates an eight and one half mile long pipeline system in Jefferson and Chambers Counties. The gas produced from the Gephardt Lease is transported by Bayou some two miles to a 20-inch pipeline owned by Union Texas Petroleum Corporation, a division of Allied Chemical Corporation. The delivery point on the 20-inch line is known as the "Jackson Pasture" delivery point.

Following the assignment to Bertman, Van Norman entered into a contract to sell his 22½ percent of the gas produced from the Gephardt Lease to Allied Chemical Corporation. The contract price was, in effect, 26 cents per mcf, and the gas was to be delivered at the Jackson Pasture delivery point. Bertman sold its 77½ percent of the gas produced to Bayou, at the wellhead, for a price of 22 cents per mcf. Bayou then transported the gas to the Jackson Pasture delivery point, where Bayou sold it to Allied Chemical Corporation for 26 cents per mcf. Van Norman's gas was transported along with Bertman's and, pursuant to his assignment to Bertman, Van Norman paid no transportation charge for the delivery of his gas.

Both Van Norman's and Bayou's gas sale contracts with Allied Chemical Corporation expired April 27, 1975. At that time, Bayou and Bertman entered a new sales contract in which Bertman agreed to sell its share of the gas produced from the Gephardt Lease to Bayou, at the wellhead, for approximately $1.438 per mcf. Bayou in turn, entered into a contract to sell that portion of the gas to Lo-Vaca Gathering System, at the Jackson Pasture delivery point, for approximately $1.89 per mcf. Van Norman also contracted to sell his share of the gas to Lo-Vaca, at the Jackson Pasture delivery point, for $1.89 per mcf. Bayou has continued to transport both Bertman's and Van Norman's gas, but Bayou now looks to Van Norman for payment of transportation charges with respect to his share.

Whether Bertman remains obligated to cover the cost of transporting Van Norman's gas to market is the subject of other litigation between Bertman and Van Norman. The immediate dispute came into being because the transportation charge initially demanded by Bayou was considered by Van Norman to be excessive. As the parties were unable to agree upon a "fair and reasonable" transportation rate, Van Norman applied to the Railroad Commission for the establishment of such a rate. His application was placed on the Commission's Gas Utilities Docket, No. 633; and a full hearing was held before an Examiner, with both parties presenting argument and evidence.

On November 23, 1976, the Railroad Commission rendered an order containing findings of fact and conclusions of law. Among

1. All statutory references are to Vernon's Texas Civil Statutes Annotated.

the Commission's most significant findings were: (1) that Bayou owns and operates a natural gas pipeline which crosses public roads; (2) that the fair value rate base of Bayou's transmission properties is $23,781.00; (3) that, with tax liability and with total operating expenses of $45,011.00, a total revenue of $47,473.00 is required for Bayou to earn an 8% rate of return on the fair value rate base; and (4) that, with the annual delivery volume Bayou can reasonably expect, a transportation rate of 4.07 cents per mcf will produce revenues of $47,473. Neither party here contends that these findings are not supported by the evidence.

In its conclusions of law, the Commission determined: (1) that Bayou is a gas utility within the meaning of Art. 6050, *et seq.*, (2) that the Commission has authority to fix a reasonable transportation rate to be charged by Bayou, (3) that the Commission has authority to compel Bayou to transport natural gas at the prescribed rate, and (4) that an 8% rate of return on the quoted fair value rate base is a fair and reasonable rate of return. The Commission proceeded to order Bayou to transport Van Norman's gas from the Gephardt Lease to the Jackson Pasture delivery point at the rate of 4.07 cents per mcf. Bayou sought judicial review of this order in the District Court pursuant to the Administrative Procedure and Texas Register Act, Art. 6252–13a § 19. As noted above, the District Court upheld the order.

In its first point of error before this court, Bayou asserts that the Railroad Commission had no jurisdiction to regulate the transportation rate to be charged by Bayou. To reach this position, Bayou places what we feel is an unwarranted construction on certain provisions of the Public Utilities Regulatory Act, Art. 1446c [hereinafter PURA].

All parties to this dispute agree that the Cox Act, Art. 6050, *et seq.*, gives the Railroad Commission authority to regulate transportation rates to be charged by pipelines such as Bayou. The term "utility" is defined in Article 6050 to include companies

. . . (2) owning or operating or managing a pipeline for the transportation or carriage of natural gas . . . if said line or any part thereof is laid upon, over or under any public road or highway of this State . . . .

Bayou does not challenge the Railroad Commission's finding that Bayou's pipelines do cross public roads. Article 6053, headed "Regulation of Utilities," provides, in relevant part:

The Commission after due notice shall fix and establish and enforce the adequate and reasonable price of gas and fair and reasonable rates of charges and regulations for transporting, producing, distributing, buying, selling, and delivering gas by such pipelines in this State.

This provision clearly encompasses the activity carried on by Bayou, and it therefore authorizes the Railroad Commission to establish and enforce "fair and reasonable rates" to be charged by Bayou for transporting natural gas through its pipelines.

Bayou argues, however, that this authority of the Railroad Commission was eliminated, at least as to "gas gathering pipelines," by the enactment of PURA. There are several stages to this argument. First, Bayou describes itself as a "gas gathering pipeline" and contends that such pipelines are excluded from the definition of "utilities" in PURA, Art. 1446c § 3(c). Bayou then looks to Section 90(a) of PURA, which provides for the repeal, effective September 1, 1976, of specific enumerated statutes and of "all other laws and parts of laws in conflict with this Act." Bayou concludes that, because "gas gathering lines" are excluded from the definition of utilities in PURA, and are included in the definition of utilities in the Cox Act, those portions of the Cox Act which give the Railroad Commission jurisdiction over gas gathering pipelines are repealed.

Bayou's argument is based on its position that under PURA, gas gathering pipelines are not utilities. Article 1446c § 3(c) is the provision relevant here; and this section includes in the definition of "utility" and "public utility" any non-municipal corpora-

tion which owns or operates for compensation in Texas, equipment or facilities for:

(3) transmitting or distributing combustible hydrocarbon natural or synthetic natural gas for sale or resale in a manner which is not subject to the jurisdiction of the Federal Power Commission under the Natural Gas Act (15 U.S.C.A., Section 717, et seq.) ("gas utilities" hereafter) *provided* that *the production and gathering of natural gas,* the sale of natural gas in or within the vicinity of the field where produced, the distribution or sale of liquified petroleum gas, and the transportation, delivery, or sale of natural gas for fuel for irrigation wells or any other direct use in agricultural activities *is not included.* [Emphasis ours]

The basic point of contention between the parties to this lawsuit is whether "the production and gathering of natural gas" constitutes ones or two excluded activities.

■ Bayou strongly urges that the word "and" between "production" and "gathering" should be read as "or," so that a company engaged in *either* production *or* gathering of natural gas is excluded from the PURA definition of utility. In support of this argument, Bayou relies on *Peacock v. Lubbock Compress Company,* 252 F.2d 892 (5th Cir. 1958), and other cases in which courts have construed the word "and" in a statute to mean "or." While there may be circumstances which call for such a construction, ordinarily the words "and" and "or" are not interchangeable. In *Board of Insurance Commissioners v. Guardian Life Insurance Co.,* 180 S.W.2d 906 (Tex.1944), this court adopted the following language from 3 C.J.S. 1068 [now 3A C.J.S. 452–453], as stating the correct rule as to interpreting "and" to mean "or."

'This construction . . . is never resorted to except for strong reasons and the words should never be so construed unless the context favors the conversion; as where it must be done in order to effectuate the manifest intention of the user; and where not to do so would render the meaning ambiguous, or result in an absurdity; or would be tantamount to a refusal to correct a mistake.'

The court in that case held that the proposed rewording of the statute in question would result in judicial legislation rather than judicial interpretation; and the word "and" was construed to mean "and."

■ Bayou has not demonstrated that substituting "or" for "and" between "production" and "gathering" in Article 1446c § 3(c)(3) is necessary to effectuate the Legislature's intent or to prevent an ambiguity, absurdity, or mistake. To the contrary, there is reason to believe that the Legislature expressly intended to exclude from PURA's definition of "utility" those entities engaged in *both* production *and* gathering of natural gas.

In the first place, if "gathering" is to stand alone, "production" must also stand alone, and there was no need for the Legislature to exclude "production" from a definition which refers to the transmission and distribution of natural gas; clearly gas cannot be transmitted or distributed until produced.

Second, we consider the construction that has historically been placed upon the definition of "utility" in the Cox Act, Art. 6050 § 2, quoted above. While this definition would appear to include any pipeline system which crosses public roads, two Attorney General's opinions have construed the definition as not including gathering systems operated by gas producers simply as an incident to their business of gas production, even though such systems did cross public roads. Atty.Gen.Op. 0–3524–A (1942); Atty.Gen.Op. WW–625 (1959). In the former opinion, the Attorney General described as a "natural and fundamental law of the gas producing business" the fact that a gas producer may need to construct a gathering system to deliver his gas to a purchaser. The opinion concluded that ". . . a producer is not engaged in the pipeline business just because he must necessarily use pipes to gather his product for marketing." Atty.Gen.Op. 0–3524–A (1942), p. 5. The Attorney General reasoned that the Legislature was aware of the "fundamental laws" of the gas production business when

it enacted Art. 6050, and we feel that the Legislature was also aware of such laws when it enacted Art. 1446c § 3(c)(3). The combined activities of production *and* gathering have traditionally been distinguished from other pipeline operations, and it is more than reasonable to infer that the combined activity is what the Legislature meant to exclude from PURA's definition of "utility."

Because we reject Bayou's contention that Article 1446c § 3(c)(3) excludes gathering systems, such as Bayou, from the PURA definition of "utility," it is unnecessary to address the remaining arguments raised under Bayou's first point of error. Since gas gathering pipelines may be considered as utilities in both PURA and the Cox Act, the conflict Bayou alleges between the statutes does not exist.

■ In its second point of error, Bayou asserts that even if the Railroad Commission did have jurisdiction to fix a transportation rate to be charged by Bayou, the Commission used an incorrect standard in establishing the rate of 4.07 cents per mcf for the transportation of the gas about two miles from the wellhead to the major pipeline connection. We disagree. As evidenced by the Commission's findings of fact and conclusions of law, summarized above, the Commission arrived at this rate by determining a fair return on the fair value rate base of Bayou's transmission properties. This was in line with the standard which is codified in PURA, Art. 1446c §§ 39 and 40, as follows:

> Sec. 39. In fixing the rates of a public utility the regulatory authority shall fix its overall revenues at a level which will permit such utility to recover its operating expenses together with a reasonable return on its invested capital.
>
> Sec. 40(a) The regulatory authority shall not prescribe any rate which will yield more than a fair return upon the adjusted value of the invested capital used and useful in rendering service to the public.

*See, Railroad Commission of Texas v. Houston Natural Gas Corp.,* 155 Tex. 502, 289 S.W.2d 559 (1959), sometimes known as the *City of Alvin* case. Bayou does not contend that the fair value rate base or expense figures used by the Commission are unsupported by the evidence, nor does Bayou contend that 8% is not a fair rate of return. Further, Bayou does not contend that it has become significantly more expensive to transport gas from the Gephardt Lease. Essentially, Bayou's position is that the pipeline company providing transportation services should get a share of the huge increase in the price of natural gas. To support this position, Bayou looks to Art. 6053, which authorizes the Railroad Commission to "establish a fair and equitable division of the proceeds of the sale of gas between the companies transporting or producing the gas and the companies distributing or selling it." Assuming that this provision is applicable to the situation here, a rate which makes a "fair and equitable division of the proceeds" must nevertheless comply with the "fair return" standards codified in PURA.

The judgment of the district court is affirmed.