# Supreme Court of Texas

No. 22-1046

Richard J. Malouf, D.D.S.,

*Petitioner*,

v.

The State of Texas ex rels. Christine Ellis, D.D.S. and Madelayne Castillo,

*Respondents*

On Petition for Review from the
Court of Appeals for the Eighth District of Texas

JUSTICE YOUNG, joined by Justice Lehrmann, dissenting.

What do robots and lawyers have in common? Maybe more than we would care to admit, but at least one answer is that only robots and lawyers could read the statute at issue the way the Court does today. The Court purports to do so in the name of textualism. But a textualist's obligation is to construe a statute in its context, giving it the meaning an ordinary English speaker would have given it at the time it was enacted. The Court instead imposes an implausible reading that *no one* would have given it when it was written. Today's reading at best adopts a *post hoc* construction of the sort that good lawyers scrambling for an escape hatch might concoct for their clients.

Specifically, the Court holds that Dr. Malouf did not violate Texas Human Resources Code § 36.002(8). Chapter 36 is titled "Health Care Program Fraud Prevention." Section 36.002 is titled "Unlawful Acts" and provides that

> [a] person commits an unlawful act if the person: . . . (8) makes a claim under a health care program and knowingly fails to indicate the type of license and the identification number of the licensed health care provider who actually provided the service[.]

Tex. Hum. Res. Code § 36.002(8). Dr. Malouf submitted nearly 2,000 claims to the State that falsely listed *his own* "identification number" rather than "the identification number of the licensed health care provider who *actually* provided the service." Did he commit what the statute calls an "unlawful act"?

The Court says that he did not. True, he failed to provide the identification numbers of the dentists who *actually* provided the services at his dental chains, and instead listed someone (himself) who certainly did *not* provide those services. That sounds bad. But, the Court says, not to worry: Dr. Malouf implicitly provided those dentists' license type (*i.e.*, "dentist") because, as it turns out, Malouf is *also* a "dentist." According to the Court, a lie about who "actually provided the service" is just as good as the truth, so long as the unnamed person who did it was a dentist.

How could the Court misread the statute so badly? How could it read the text that I quoted above and think that the legislature was indifferent to knowing "who actually provided the service" for which the State is being billed? It is because the Court does not engage in a "context-sensitive interpretation of [the statute] *as a whole.*" *United States v. Palomares*, 52 F.4th 640, 649 (5th Cir. 2022) (Oldham, J.,

2

concurring). It instead zeroes in on the word "and" to justify giving the statute a meaning that its context will not remotely bear. I hope the Court is not serious about what it says, because if it is, *every* statute, contract, deed, will, ordinance, or other document will now be subject to a hyper-literal insistence on how to read the word "and"—and will often still get it wrong. It is the Court, not I, who makes "and" mean "or"— a checklist using "and" to link *requirements* now is just stating two mere *options*. Fun days ahead—at least for lawyers who bill by the hour.

The canons of construction are the essential tools for interpreting legal documents. But like the tools of every trade, the canons must be wielded with reference to their object. Our goal is to understand the meaning of a text in its context. Common English usages—like the fact that sometimes there is no semantic difference between choosing "and" rather than "or," as we all know—need not be sacrificed at the altar of textualism. Such a sacrifice does no honor to its purported deity. I fear that the Court's approach reflects a turn to a false god—one who tempts with the lure of easy answers and happy outcomes—while disavowing the hard work of faithfully and accurately discerning a text's true meaning.

The result today is that Dr. Malouf walks away scot-free. Among those who will be surprised by this result is Dr. Malouf. The argument that the Court adopts is his "alternative argument," as the Court acknowledges. *See ante* at 13–14. His far more modest lead argument merely asserts that there are fact questions about whether he "knowingly" listed the wrong provider, so the Court should send the case back for trial. *Id.* at 13. Unlike the lead argument, the "alternative" is a kill-shot—one on which he spends scant pages in both his opening and

3

reply brief, compared to the many pages devoted to his lead argument. The Court should not have fallen for it, and I doubt that Dr. Malouf or his counsel thought that we would. But as is often said at legal conferences and when lawyers tell their war stories, one *never really knows* what a court will do. Today's decision should be added to the lore.

I respectfully dissent.

## I

We all agree that this case turns on the text of the Medicaid Fraud Prevention Act. Specifically, the statute says that it is unlawful to "make[] a claim under a health care program and knowingly fail[] to indicate the type of license *and* the identification number of the licensed health care provider who actually provided the service." Tex. Hum. Res. Code § 36.002(8) (emphasis added). The case turns on this question: what does the italicized "and" mean?

In my view, "and" plays its normal role of joining both prongs. The statute creates a short checklist of *two* things (not just one or the other) that a provider must list: the license type + the identification number. Failing to "indicate" either of them violates the statute, just like failing to put both ham and cheese on a sandwich would violate the Court's hypothetical deli order: "Don't forget to put ham and cheese on my sandwich." *Ante* at 22. In our new age of artificial intelligence, I suppose that a robot waiter or a robot cook (or should I say "*and* a robot cook"?) would feel justified in serving a sandwich as soon as *either* ham *or* cheese is placed between slices of bread. But a human would regard the order as incomplete and would feel no guilt in sending it back.

The conjunctive meaning of the stated statutory requirements is

4

clear from the statute's text, context, and textually expressed function. But the Court insists on an arid reading that would make even a 1950s high-school English teacher blush. Treating the "and" as really meaning "or"—that the provider can list one *or* the other to escape any consequence—is grammatically permissible (barely), as with the concomitant sandwich in the deli. But it is not a remotely reasonable reading and gives no hint of pursuing an accurate rather than a tendentious interpretation of the statute.

## A

As I read it, "and" conveys its normal grammatical meaning and plays its normal role—it imposes a joint requirement by listing *two* things (A *and* B) that a provider must indicate. But suppose for the moment that the Court would accept the dual-requirement reading if the legislature instead had used "or" in the statute. Even under the dubious assumption that "or" would satisfy the Court,[1] that does not mean that "and" means anything different *in this context*. We have properly held that "and" and "or" *generally* are not interchangeable. *In re Brookshire Grocery Co.*, 250 S.W.3d 66, 69–70 (Tex. 2008). They are, of course, *usually* distinct in meaning: "in a legal instrument, *and* joins a conjunctive list to combine items, while *or* joins a disjunctive list to create alternatives." *Conjunctive/Disjunctive Canon*, Black's Law Dictionary (11th ed. 2019).

"Not A, not B, *and* not C," however, is logically equivalent to "not

---

[1] [Narrator: The Court would not. If it will not accept "and," it would not accept "or," but would make the very same argument in the photographic negative, saying *if the legislature wanted both, it would have said "and!"*]. *See also infra* note 3.

(A, B, *or* C)."  Linguistic context thus enables us to "move back and forth between disjunctive and conjunctive propositions as long as we are mindful about negations, as well as 'our p's and q's.'"  R.E. Houser, *Logic as a Liberal Art: An Introduction to Rhetoric and Reasoning* 343 (2020).  Therefore, as Chief Justice Greenhill put it for the Court, we have also recognized that "there may be circumstances which call for such a construction" in which "and" is construed to mean "or," even if we try hard to avoid those constructions.  *Bayou Pipeline Corp. v. R.R. Comm'n*, 568 S.W.2d 122, 125 (Tex. 1978); *see also De Sylva v. Ballentine*, 351 U.S. 570, 573 (1956) ("the word 'or' is often used as a careless substitute for the word 'and'; that is, it is often used in phrases where 'and' would express the thought with greater clarity"); Bryan A. Garner, *Garner's Modern English Usage* 49 (4th ed. 2016) ("*and* is frequently misused for *or* where a singular noun, or one of two nouns, is called for").[2]

Depending on its statutory context, therefore, "and" can have several meanings.  Some may be the opposite of how that word normally functions; some may simply be interchangeable with the word "or."  When that happens, a court does not rewrite "and" to mean "or"—*that is what it meant all along.*  It is basic to our language that the same word can mean

---

[2] This linguistic phenomenon is not merely an academic or logical trifle, but in fact occurs in parlance ranging from the mundane to the literally divine.  Did Jesus mean that someone who "left" his "children, for the kingdom of God's sake," but who refused to leave his "house, or parents, or brethren, or wife" for that cause will still be richly rewarded?  *See Luke* 18:29–30 ("Verily I say unto you, There is no man that hath left house, or parents, or brethren, or wife, or children, for the kingdom of God's sake, Who shall not receive manifold more in this present time, and in the world to come life everlasting."); *cf. Luke* 14:26 ("If any *man* come to me, and hate not his father, *and* mother, *and* wife, *and* children, *and* brethren, *and* sisters, yea, *and* his own life also, he cannot be my disciple." (emphasis added)).

different things or function in different ways, so we rely on context to discern the applicable meaning. Sometimes that meaning is so evidently clear that we barely notice. "He tapped the mouse" and "he caught the mouse" give the word "mouse" two very different meanings—although both sentences *could* deploy either meaning. This point is so commonplace as to be truly banal.

Particularly relevant here, "and" can be used in "a distributive (or several) sense *as well as* a joint sense." Bryan A. Garner, *Garner's Dictionary of Legal Usage* 639 (3d ed. 2011) (emphasis added). The Court chooses the distributive sense: no problem unless a claimant knowingly fails to provide *both* his license type *and* his identification number. *See ante* at 32. Sometimes this use is the only reasonable one. Judge Willett offered this example: "'Do not mix heat, fuel, and oxygen' instructs the reader to prevent the unity of all three ingredients unless she wants a fire." *Palomares*, 52 F.4th at 653 (Willett, J., dissenting). Mixing any two is fine—no fire unless heat, fuel, *and* oxygen are present. So I readily agree that the Court's reading—that there is no statutory violation unless the claimant (1) fails to provide her license type *and* (2) fails to provide her identification number—is *grammatically* possible. But if three colleagues will get into trouble in *any* combination, one could say "Do not mix Adam, Ben, and Cole" without meaning that it is fine to have two but not all three of them. I take the Court to agree with this basic principle. *Ante* at 21–22.

The examples and counterexamples are tiresome because they are inexhaustible. That very point, however, proves that *context* is what matters. The ham-sandwich example hardly stands alone. To take

7

another, suppose a dentist (maybe even Dr. Malouf—or at least someone using his identification number) tells a patient to "brush *and* floss your teeth." Or, to inject the negative, "you'll be paying dental bills if you forget to brush and floss your teeth." Even simply "don't forget to brush and floss." One who brushes without flossing will pay a price—gingivitis or worse—for giving the dentist's advice a bizarre but grammatically tolerable meaning.

I suppose that the legislature *could* commit itself to drafting only asyndetic statutes—avoiding conjunctions at all costs and using structure, subparts, and other language to eliminate any contrary grammatical reading. And sure, the legislature could have written this statute to more directly say what it meant.[3] Greater clarity is always

---

[3] The Court thinks it is attacking me by saying that "[i]f the Legislature mistakenly used the term 'and' instead of 'or' in Section 36.002(8), it is up to the Legislature—not the courts—to amend the statute to fix that mistake." *Ante* at 29 n.19.

The Court mistakes my point. I agree that courts are not in the business of correcting drafting errors (at least those that are not scrivener's errors, *see* Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 134–35 (2012)). But this statute contains no drafting (or scrivener's) error. *As drafted*, it means that a provider must indicate *both* the license type *and* the actual provider's identification number. As I explain below, the word "and" (like many words) can mean different things in different contexts, and in *this* context, the Court's reading is unreasonable. In other words, I hardly propose to (improperly) "fix" some substantive legislative "mistake," but instead to (properly) apply the statute as the legislature wrote it, in light of its statutory context and the statute's textually expressed function.

Regardless of all that, I doubt that the alternate phrasing would "fix" the legislature's supposed "mistake." If the statute replaced "and" with "or," the parties would still be before us. The State would argue that a knowing failure to provide *either* the license type *or* the identification number violates the statute. Dr. Malouf would argue that "or" gives claimants a choice: so long as

desirable and nearly always possible.  (For judicial opinions, too—not just statutes.)  But courts cannot "demand (or in truth expect) that [the legislature] draft in the most translucent way possible." *Pulsifer v. United States*, 144 S. Ct. 718, 729 (2024).

Statutes end up as they do for a myriad of reasons—speed as the session comes to an end, compromise in merging House and Senate versions, desire to minimize revisions to existing laws, the fusion of competing versions of a text, human frailty, and so many others.  True, such circumstances sometimes lead to an enactment that unambiguously requires something the legislature likely did not want—and when that happens, we must follow the actual law.  But when we interpret the law in the first place, we are not required to give the legislature the *least* charitable reading we can.  Indeed, we are not *authorized* to do so.  We must instead "'ascertain and give effect to the Legislature's intent,'" and we do so by "enforc[ing] the plain meaning of statutory text, *informed by its context*." *Hegar v. Health Care Serv. Corp.*, 652 S.W.3d 39, 43 (Tex. 2022) (emphasis added) (quoting *In re D.S.*, 602 S.W.3d 504, 514 (Tex. 2020)).  After all, "[w]ords in a vacuum mean nothing.  Only in the context of the remainder of the statute can the true meaning of a single provision be made clear." *McLane Champions, LLC v. Hous. Baseball Partners, LLC*, 671 S.W.3d 907, 920 (Tex. 2023) (quoting *Bridgestone/Firestone, Inc. v. Glyn-Jones*, 878 S.W.2d 132, 133 (Tex. 1994)).  Specifically in

---

the claimant provides the license type *or* the identification number, there is no violation.  We would still have to resolve the question if the legislature made the single wording switch. *See Pulsifer v. United States*, 144 S. Ct. 718, 729 (2024) ("[W]e doubt that substituting 'or' for 'and' would have delivered us from interpretive controversy.").

9

statutes like this one—where the use of "and" within a statement is at issue—"context may drive such a statement in either direction." *Pulsifer*, 144 S. Ct. at 729 n.5 (offering examples using an *identical* linguistic structure but where "and" will bear opposite meanings).

## B

So if context is indispensable to determining meaning—and the Court at least says that it admits this, *ante* at 6, 23–27—the case should be easy. The Court's reading is unreasonable, and the answer to why that is so "lie[s] in considering the [statute's] text in its legal context." *Pulsifer*, 144 S. Ct. at 731.

Context comes in many forms. Some are irrelevant, but those drawn from the text itself are certainly proper for courts to use. More to the point, we cannot smuggle in impermissible grounds just by *calling* something "context." But the full text is always legitimate. When interpreting a statute to resolve another "and-or" dispute, for example, we referred to a "succeeding clause" as one way to contextualize the meaning of "and." *Bd. of Ins. Comm'rs v. Guardian Life Ins. Co. of Tex.*, 180 S.W.2d 906, 909 (Tex. 1944). Here, the succeeding clause is this phrase: "of the licensed health care provider who actually provided the service." Tex. Hum. Res. Code § 36.002(8). This phrase modifies *both* the (1) license-type *and* (2) identification-number prongs. *See ConocoPhillips Co. v. EPA*, 612 F.3d 822, 839 (5th Cir. 2010) ("Nouns joined by coordinating conjunctions are usually treated as a single, compounded unit, and a postmodifying prepositional phrase is most naturally read to modify that single unit.").

The successive phrase contextualizes how we should construe the

word "and."  The statute tells a claimant to provide the license type *and* identification number to enable the State to *know* the true identity "of the licensed health care provider who *actually* provided the service."  Tex. Hum. Res. Code § 36.002(8) (emphasis added).  Providing *only one* of those two requirements contravenes this clear textual mandate.

The two required data points are not substitutes but are quite notably at opposite ends of the spectrum.  The license type is the most general ("dentist"); the identification number is the most granular (one specific dentist *and no other*).  The statute is openly and expressly an *anti-fraud* statute, too—not just one to *punish* fraud, or even just to *detect* fraud, but to *prevent* it altogether.  Again, Chapter 36 of the Human Resources Code is titled "Health Care Program Fraud *Prevention.*"  So is it really plausible that the legislature is indifferent about which of two fundamentally dissimilar data points are provided?  Is it plausible that the legislature is indifferent to receiving *false* information about one data point, so long as it receives *accurate* information about the other—yet does not even care to know *which one* is true and which is false?

The answer, of course, is no.  Both data points, after all, could be useful in various anti-fraud efforts.  They could work together in individual cases as a kind of check—if a license type and identification number did not match, that would signal that something has gone awry, flagging the claim for more attention.  Even taken separately, both data points could be useful in different ways.  For example, given how many Medicaid claims are made, it would surely be useful to sometimes generate reports to see if there are outliers or patterns about the *type* of provider who performs specific kinds of treatments.  If certain services

11

are normally provided by "dental hygienists," running reports to see when they are provided by "dentists" could help identify anomalies, which might lead to further analysis, audits, improvements, or the like. Other circumstances—especially if there *is* an audit—might make the license type irrelevant, but make it very important to know the individual provider. Many of these purposes would not be possible if the form includes one data point but not the other—or, perhaps worse, if the form *accurately* includes one but *falsely* includes the other.

So can anyone seriously think that the legislature just does not care if the data it demands is corrupted in this way? That the legislature *only* cares about getting *one* piece of accurate data for any individual claim, without *any* interest whatsoever in being able to reliably detect trends in specific practices, regions, or across the State? Reading the statute in such a way is puzzling *at best*.

To be clear, all we are doing is reading *the statute* to see what *the statute* contemplates. But the Court reads the statute anachronistically—it relies on a current *form* that is not part of the statute, and reasons backwards to conclude that this later-adopted *form* reached back from the future to determine the meaning of the *statute*. *See ante* at 24–25 (relying on the "Medicaid-approved claim form").

Let me explain what is going on. The *statute* (which again is what matters) requires the license type and individual identification number. The statute applies to *all* Medicaid providers, not just dentists. As it turns out, at least for dental providers and during the time at issue, the Health and Human Services Commission could ascertain *both* required data points if given the "Texas Provider Identifier" number, so the then-

12

current claim form requested only that.[4]  It is easy to see how that could happen.  Imagine that a statute demanded a license number and a date of birth, and that when the statute was enacted, nothing in the license revealed a birth date.  But imagine that over time, the licensing authority began adding the birth date as the final digits of a license.  At that point, asking for *only* the license number would satisfy both statutory

---

[4] As the Court explains, the Medicaid claim form at use here included only one box—the identification-number box—and did not have a place for claimants to separately indicate a provider's license type.  *Ante* at 15.  Because the license type is linked to a provider's identification number, I agree with the Court's conclusion that the submission of an accurate identification number provided both pieces of information.  *Id.* at 14–15.

The record indicates, however, that the claim form in use during the relevant timeframe for this litigation (2007–2010) was "dental specific."  And in the current Texas Medicaid Provider Procedures Manual, dentists participating in the THSteps program are required to submit an ADA Dental Claim Form.  Tex. Health & Hum. Servs., *Texas Medicaid Provider Procedures Manual: Vol. 1, Section 6: Claims Filing* (2024).  By submitting a "dental specific" form, one could argue that the claimant impliedly indicated the license type as "dental."  Would that be enough for the Court?

The point, though, is that the Court's holding would apply with equal force if the form included *two* boxes: one for the identification number and one for the license type.  As it happens, the *current* claim form appears to ask for both.  The Texas Medicaid Provider Procedures Manual requires a dental claimant to submit a unique provider identifier number *and* a taxonomy code for all paper claims.  *Id.*  "A taxonomy code is a unique 10-character code that designates [a medical provider's] classification and specialization."  *Find Your Taxonomy Code*, Centers for Medicare & Medicaid Services, https://www.cms.gov/medicare/enrollment-renewal/providers-suppliers/health-care-taxonomy (last visited June 18, 2024).  In other words, the taxonomy code is a unique number that identifies a provider's license type.  The manual then states why the claim form requires a taxonomy code *in addition to* the provider's identifier number: the former is "used to crosswalk the [provider's unique identifier number] to the billing provider."  Tex. Health & Hum. Servs., *Texas Medicaid Provider Procedures Manual*, *supra*.

But good news, dentists: the Court has now dispensed with this requirement, despite how sensible and useful it likely is.

requirements. But if the licenses stopped including birth dates, then the form would need to ask for both.

Both in the real circumstances of today and in my hypothetical, however, it remains important to accurately reflect *both* data points. In today's case, for example, the form requested only the identification number because, if listed *accurately*, it would accurately generate both required data points. *Falsely* listing the identification number guarantees that both required data points *cannot* be accurate. At most, as here, a false identification number might match the correct license type. (And in the dental world, it *often* will—"dentist" is hardly rare.) But at no point could the Commission ascertain *both* data points from the license type alone, no matter how a claimant provided that information. A *false* identification number certainly cannot generate an *accurate* identification number.

Yet under the Court's construction, a claimant may just make up the identification number, or use someone else's, or leave it blank—as long as he somewhere scribbles what his license type is or otherwise so indicates. Any of those actions *ensure* that the State will not know the identity of the person "who actually provided" the medical services—the one thing that the statute makes abundantly and expressly clear it wants. Yet the Court excludes such falsehoods from the statute's prohibitions, and says that all the State needs to know is that some anonymous "dentist" did the work—*maybe* the one whose identification number is used, maybe not. Who knows? That really narrows it down. How helpful.

The Court, in other words, says that "indicat[ing]" the "license type" is *all* the statute requires—form or no form. This case shows the

14

consequences of that view. When a particular identification number embeds *both* data points, as with the "TPI" that the then-current form requested, *see ante* at 15–16, the truth about both is revealed with one accurate number. Telling a lie will often accurately generate the license type, but *never* the identification number. The Court thinks that the legislature is fine with the lie—that it *unambiguously* approved the lie.

The Court invokes statutory context to defend this remarkable conclusion in three ways: (1) that the construction that *I* advance is allegedly surplusage, *id.* at 24–25; (2) that the statute's use of the word "or" in nearby provisions proves that it uses "and" the way the Court claims, *id.* at 25–27; and (3) that the statute is not stated as an "affirmative command," *id.* at 27 n.19. That *these* are the best arguments just proves that there *are* no good arguments.

**1**

First, the Court argues that *both* the license type *and* the identification number of the person who actually provided the medical service are not necessary, so reading the statute to require both would "result[] in superfluity," *id.* at 24, because *the claim form* only requires the identification number, which (if accurately supplied) necessarily provides both pieces of information, *id.* at 24–25.

As I have just described, I accept the point as far as it goes: an *accurate* identification number would supply both pieces of information. But the converse is *never* true. Providing *just* an accurate license type is to *fail* to provide an accurate identification number (using any mechanism other than actually providing an accurate identification number, of course—the very thing that both the form and the statute

15

expressly request, and what the Court says can be ignored). Giving the Commission only the license type would, as here, leave the Commission in the dark about who *actually* performed the service—either forever or only after substantial effort and expenditure of time and resources to get at the truth.

But again, to understand what the *statute* means, who cares what the *form* requires? The form—which an *agency* adopted after the *legislature* enacted the statute—tells us nothing about the statute's meaning. I can imagine one scenario where the fact that the form only asks for the identification number might matter: to a dentist who *accurately* listed that number. If the State were to later seek to impose penalties on such a dentist for not *separately* listing a license type—which the form does not request and which is embedded in the identification number the provider supplies—it might well violate due-process principles. *See, e.g.*, *Mosley v. Tex. Health & Hum. Servs. Comm'n*, 593 S.W.3d 250, 262–69 (Tex. 2019) (holding that due process forbids the government from insisting even on correct legal requirements when the government has misled the regulated party about what they are). But no one is holding Dr. Malouf accountable for not separately listing the license types of the providers at his dental chains—the State seeks to hold him accountable for not listing the providers' actual identification numbers, which both the form *and* the statute demand.

The Court is wrong to collapse the identification-number and license-type requirements for another reason: the legislature is perfectly free to impose overlapping requirements. Creating an account on most any website requires someone to enter a new password twice, just to make

sure there was no typo; overlapping informational requirements can likewise minimize error or promote accuracy in other contexts.[5] There are likely many other reasons why the legislature might choose to require more than the bare minimum to achieve a valid regulatory objective, such as detecting fraud or other problems (or, more benignly, to ensure that payment gets to the right place as rapidly as possible). It is beyond this Court's authority to invalidate or minimize such a legislative choice simply because *a hypothetical* set of facts would render that choice meaningless. *See BankDirect Cap. Fin., LLC v. Plasma Fab, LLC*, 519 S.W.3d 76, 86 (Tex. 2017) (noting that "we read unambiguous statutes as written, 'not as they make the most policy sense'" (quoting *Combs v. Health Care Servs. Corp.*, 401 S.W.3d 623, 629 (Tex. 2013))); *MCI Telecomms. Corp. v. Am. Tel. & Tel. Co.*, 512 U.S. 218, 231 n.4 (1994) (noting that courts "are bound, not only by the ultimate purposes [the legislature] has selected, but by the means it has deemed appropriate, and prescribed, for the pursuit of those purposes").

The *real* facts here prove the point. Providing an accurate identification number may turn out to satisfy both requirements—which

---

[5] As further examples of why more information may be required in a form than what appears necessary at first glance, consider that when a provider enrolls in Texas Medicaid, he or she enrolls in one of four enrollment types: Individual, Group, Performing Provider, or Facility. The Medicaid scheme requires some licensees to enroll in certain categories—for example, "dieticians, licensed vocational nurses, occupational therapists, registered nurses, and speech therapists" must enroll in the Individual category. The Medicaid scheme also requires that some providers enroll in the Performing Provider category whenever that individual "is seeking enrollment under a group." *Whatever* the underlying policy rationales were, however, it is entirely improper for courts to vitiate the legislature's choices simply because they make little policy sense. Separation of powers demands more; it is the courts' job to say what the law *is*, not what it *should be*.

is presumably why the form was structured as it was—but *this* case involves a dentist who provided an *inaccurate* number on *thousands* of claims.  There is, in short, no "superfluity" here.

**2**

Second, the Court invokes the presumption of consistent usage—that the statute's disjunctive use of the word "or" in nearby provisions supports reading "and" to have a conjunctive meaning (or "distributive sense") here.  *Ante* at 25–27.  Even assuming that the Court correctly categorizes the various uses of various conjunctions, the canon has no role to play in this case.

What is the canon?  In *Colorado County v. Staff*, the Court described it by quoting a statute: "Stated another way, 'words and phrases that have acquired a technical or particular meaning, whether by legislative definition or otherwise, shall be construed accordingly.'"  510 S.W.3d 435, 452 (Tex. 2017) (brackets omitted) (quoting Tex. Gov't Code § 311.011(b)).  Defined terms, for example, usefully allow the legislature to use a single term to convey a concept that would otherwise require tedious repetition of lengthy, specialized meanings.

This basis does not remotely support the Court's theory that provisions like § 36.002(10), which use "or" disjunctively, make its construction of the word "and" in § 36.002(8) reasonable.  As far as I know, neither this Court nor the U.S. Supreme Court has *ever* applied the presumption of consistent usage to the word "and."  To the contrary, the Supreme Court recently noted the novelty of such an argument *in this very context*, rejecting the applicability of such a presumption "to words as ubiquitous and . . . sometimes context-dependent as 'and' and 'or.'"

18

*Pulsifer*, 144 S. Ct. at 735.[6]

Understandably so: "and" and "or" are the exact opposite of words that take on a technical or particular meaning, whether by statutory definition, context, or otherwise. As the Supreme Court put it, "[t]he principle is mostly applied to terms with some heft and distinctiveness." *Id.* (using "principal activity" and "money remuneration" as examples). Frankly, it is hard to imagine a *less* technical, substantive, particularized, hefty, or distinctive word than "and."

Trying to force a "consistent usage" discipline on the legislature's uses of conjunctions, particularly in sentences with highly complex structures, is also troubling because *we know* that the presumption of consistent usage "is so often disregarded," which is why it "is particularly defeasible by context." Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 171 (2012); *see also S.C. v. M.B.*, 650 S.W.3d 428, 445 (Tex. 2022) ("the consistent-use canon depends heavily on context").

Without the "defeasib[ility]" of this canon, we probably could not have the canon in the first place. The canon, after all, is an *aid* in reaching the meaning the legislature actually adopted, not a way for courts to punish the legislature for being less punctilious than members of this Court might (sometimes) demand. In other words, we use the

---

[6] To quote the Court more fully, it observed that the petitioner in *Pulsifer* "breaks new ground in applying the [presumption of consistent usage] to words as ubiquitous and (as shown above) sometimes context-dependent as 'and' and 'or.'" 144 S. Ct. at 735. Amazingly, the Supreme Court of Texas now chooses to till the same "new ground," and even quotes *Pulsifer* for the general principle, *see ante* at 26, without mentioning that *Pulsifer* pulverized the attempt to do so here.

canon because it makes sense. When the legislature repeatedly uses a particularized term and gives no reason to think that any of those uses bear a different meaning, it would disrespect the legislature to interpret the same word differently. The same is true in ordinary speech. Someone who says "the president" to refer to the president of the school board six times in a conversation probably is not referring to President Biden in her seventh usage—unless context shows a changed meaning (such as the seventh usage coming an hour later and after someone else starts talking about national politics).

We thus *presume* that a use of the same term is purposeful—that drafters use the same term to mean the same thing, just as anyone typically does in ordinary speech. But as with ordinary speech, it is just a rebuttable *presumption* for statutory interpretation—drafters often "use *different* words to denote the same concept," so statutory context (with a little common sense sprinkled in) is essential. Scalia & Garner, *supra*, at 170 (emphasis added). Forcing the same term to bear the same meaning when context *refutes* consistent usage is just as bad as giving terms different meanings when nothing in the context suggests any such variant. This defeasibility principle applies even to specialized terms, much less to a *conjunction*, for goodness' sake.[7]

---

[7] The Court claims that I would "only" apply the canon to terms that have a technical or specialized meaning, *not* conjunctions. *Ante* at 26 n.18. I am perfectly happy to assume that, in *some* contexts, the canon of consistent usage *might* apply to conjunctions. My point transcends all that: courts should wield the doctrine carefully. It should *never* be used to justify adopting an otherwise acontextual reading of a term. And because conjunctions are so far away from the kinds of words whose repetition implies shared meaning, they are among the *least* likely to warrant application of the canon (or, in Justice Scalia's term, the

Examples of statutes that illustrate the danger of whipping out the consistent-usage canon on conjunctions are almost endless. Here is one from the Transportation Code. Vehicles' headlights must be turned on "(1) at nighttime; *and* (2) when light is insufficient *or* atmospheric conditions are unfavorable so that a person *or* vehicle on the highway is not clearly discernible at a distance of 1,000 feet ahead." Tex. Transp. Code § 547.302(a) (emphasis added). Under the Court's reasoning, because that section uses the word "or" disjunctively, we can reasonably construe "and" conjunctively. So drivers must use lights only when *both* (1) *and* (2) are present, even though the law obviously commands that lights be used in *either* situation, *independent* of the other. No rational, law-abiding citizen would read the statute as not requiring lights in heavy fog or pouring rain during the day. *See State v. Gammill*, 442 S.W.3d 538, 541 (Tex. App.—Dallas 2014, pet. ref'd) (holding that, when viewing "the statute as a whole, the plain meaning of the text imposes a duty to display lights during two alternative time periods"). But someone convicted under this provision for a daytime violation now has the prestige of the Supreme Court of Texas itself to argue that the statute *unambiguously* precludes any duty to have the lights on.

Here is another example. Section 48.02 of the Penal Code is titled "Prohibition of the Purchase *and* Sale of Human Organs." Tex. Penal Code § 48.02 (emphasis added). Under the Court's reasoning, that title suggests that the statute would prohibit only the purchase *and* sale of organs; a seller of organs who did not first purchase those organs is in the

---

*most* likely where the canon is "defeasible"). So I am where the U.S. Supreme Court is—applying the canon to conjunctions like "and" is unprecedented and weird, but I need not disclaim the possibility. *See Pulsifer*, 144 S. Ct. at 735–36.

clear. Such a construction makes no sense, as the statutory text (enacted at the same time as the title) reflects—it punishes one who "knowingly or intentionally offers to buy, offers to sell, acquires, receives, sells, *or* otherwise transfers any human organ for valuable consideration." *Id.* § 48.02(b) (emphasis added).[8] The Court ties itself in knots about this example, *see ante* at 28 n.19 (the fourth paragraph of the footnote), but again misses the point. *The same legislature* enacted both the title and the text in the same bill, which shows that the legislature does not feel quite as bound to "consistent usage" of conjunctions as the Court now thinks it ought to.

The larger point, of course, is that there are many contexts in which there is no real difference between "or" and "and." Because of that linguistic truism, the legislature was not really *inconsistent* in any meaningful way in any of these examples, and certainly not here.

**3**

The Court also argues that I cannot be right because the statute does not affirmatively require two pieces of information, but instead deems "wrongful" a "fail[ure] to indicate the provider's identification number *and* license type." *Ante* at 27 n.19. Semantics. The following two circumstances are not different: (1) affirmatively requiring two things to avoid punishment and (2) punishing a failure to provide only one of two things. Either way—because it is in fact just one way, written differently—the statute here requires both.

---

[8] We have ways of dealing with statutory titles that conflict with statutory text, of course. But because I do not read conjunctions the way the Court insists on doing, I find no conflict here. In any event, the point I make is not substantive—it is about how the legislature *uses* conjunctions.

## C

Part of statutory context is what the statute tells us about its role in a larger statutory scheme. "Purpose" has a bad name because of "purposivism"—the school of thought that, without any particular textual anchor, determines at a high level of generality what the "purpose" of a statute is and then forces the text to conform to that discovered purpose. *See, e.g.*, Scalia & Garner, *supra*, at 19; *accord Pulsifer*, 144 S. Ct. at 737 ("No law pursues its . . . purposes at all costs.") (brackets omitted) (quoting *Luna Perez v. Sturgis Pub. Schs.*, 598 U.S. 142, 150 (2023)). This historic abuse of purpose is unfortunate for many reasons, not least this: "The term *purposivism* suggests, wrongly, that its supposed antonym— namely *textualism*—precludes consideration of a text's purpose. This is not so. It is untrue that a textualist judge must 'put on blinders that shield the legislative purpose from view.'" Scalia & Garner, *supra*, at 20 (quoting William D. Popkin, *An Internal Critique of Justice Scalia's Theory of Statutory Interpretation*, 76 Minn. L. Rev. 1133, 1142 (1992)). To the contrary, purpose, "in its concrete manifestations as deduced from close reading of the text," is utterly essential to true textualism. *Id.* Understood in this light, "[t]he evident purpose of what a text seeks to achieve is an essential element of *context* that gives meaning to words." *Id.* (emphasis added); *see also Tex. Dep't of Transp. v. City of Sunset Valley*, 146 S.W.3d 637, 642 (Tex. 2004) (noting that "[w]e also consider the objective the law seeks to obtain" when construing statutes).

Put another way, a statute's purpose, as revealed by the text's plain meaning, is just another part of the statute's legal context. Statutorily expressed purpose can helpfully eliminate alternatives that,

while *grammatically* possible, are deemed unreasonable because they are inconsistent with the statutory text.

Here, the statutory text reveals both a general and specific purpose, which provides essential context that requires rejecting Dr. Malouf's reading. Start at the top, with the title, which I have mentioned before. I wholly agree that the "title of a statutory provision cannot override the plain meaning of the underlying text," but "a title can at least 'inform the inquiry into the Legislature's intent.'" *Brown v. City of Houston*, 660 S.W.3d 749, 754 (Tex. 2023) (quoting *TIC Energy & Chem., Inc. v. Martin,* 498 S.W.3d 68, 75 (Tex. 2016)). The heading to Chapter36 of the Human Resources Code was recently amended to read: "Health Care Program Fraud Prevention." Act of May 16, 2023, 88th Leg., R.S., S.B. 745, § 2. It was similar as originally enacted: "AN ACT relating to the prevention of Medicaid fraud." Act of May 27, 1995, 74th Leg., R.S., ch. 824, H.B. 2523. The legislature's overarching motive is pretty obvious: to avoid squandering limited resources, it wants to pay only valid claims, including for treatments performed only by those licensed under the Medicaid scheme. The State does *not* want to pay for *unauthorized* medical services, and to that end has chosen to minimize the number of fraudulent claims by making it easier to detect fraud and by penalizing claimants who make fraudulent claims or claims that violate the anti-fraud requirements.

The claim-reporting requirements—and the heavy consequences of violating them—are part of the effort to "prevent" fraud. Knowing the identity "of the licensed health care provider who actually provided the service" is one of the legislature's specifically enumerated means of

accomplishing that end. Tex. Hum. Res. Code § 36.002(8). Knowing the healthcare provider's identity greatly facilitates determining the claim's legitimacy in a cost-effective and efficient manner. According to the Court, though, the State has really asked for nothing more than a provider's license type. The Court's holding today tells the State (and providers) that a complete lie—writing in some other person's number who did *not* provide the treatment—is treated as *compliance*, just as long as that other person has the same license type.

This reading fundamentally—and, I must say, rather obviously—botches the whole thing. Giving the State nothing but "license type"—how many dentists are there?—reads the text in a way that essentially renders the most important part (the identity of the *actual provider*) a dead letter. The Court's interpretation *impedes* the statutory goals and function. Telling the State that it cannot require the provision of an accurate identification number (so long as the license types match up—but how would the State *know that* if it does not know who the actual provider is?) makes it harder for the State to verify that the claim is in all respects proper, and makes it harder to conduct the sort of anti-fraud monitoring that I described above.

The Court's reading of this fraud-*prevention* statute is one that makes fraud *easier*. The statute's textually derived purpose confirms yet again that the only reasonable way to construe the statute is to require claimants to provide *both* pieces of information (which, in this context, is achieved by giving an accurate identification number, but is *not* achieved by giving only an accurate license type).

The Court recasts the statutory purpose as "preventing fraudulent

25

harm to the Medicaid program." *Ante* at 32. As long as the fraud does not disrupt the State's ability "to properly process claims and distribute the appropriate amount of funds to the provider," the statutory purpose is to *not* punish those who make false claims. *Id.*

This argument fails for at least two reasons. First, even accepting the Court's formulation, the "harm" to the State extends beyond *paying* unauthorized claims. The State is harmed because it lacks the information that it needs to investigate whether a claim is authorized in the first place. If all the State knows is that some anonymous dentist did the work, it will either pay up despite being in the dark or have to determine (1) who *actually* performed the services and (2) whether the claim is otherwise authorized. When that inefficient and costly process is multiplied by the millions of Texans enrolled in Medicaid, it is easy to see why the legislature demanded information to enable cost-effective and efficient ways to verify claims or detect patterns of noncompliance.[9] So even if the State ultimately determines that a particular claim *is* authorized, incomplete or false information necessarily harms its ability "to properly process claims."

Second, and more fundamentally, it is quite dangerous to suggest that some lies are no big deal. Even if the procedures *were* authorized, providing false information about them *is* a big deal, and not only because of the indirect costs that such false information imposes. Yes, the parties

---

[9] There were over *five million* people enrolled in Medicaid in Texas in 2022. Tex. Health & Hum. Servs., *Texas Medicaid and CHIP Full Benefit Caseload By Risk Group By County—State Fiscal Year 2022* (2023), https://www.hhs.texas.gov/sites/default/files/documents/enrollment-by-county-final-sfy-2022.xlsm (last visited June 18, 2024)

have stipulated that properly qualified dentists performed the procedures in this case. If one conceives of the harm as limited to the delta between what the State actually paid and what it would have paid had the forms told the truth, then the lies may have been "harmless." But we are not talking about tort or contract damages. The lie here is a violation of an important regulatory-enforcement law that requires accuracy for different reasons.

Securities laws enforced by the government provide a useful analogy. When Congress passed the Investment Advisers Act of 1940, it "empower[ed] the courts to enjoin any practice which operates 'as a fraud or deceit,'" but did not "intend[] to require proof of . . . actual injury to clients." *SEC v. Cap. Gains Rsch. Bureau, Inc.*, 375 U.S. 180, 192 (1963). Similarly, the Securities Act of 1933 "makes unlawful the making of untrue statements of material fact or the omissions of such a fact." *United States v. Tallant*, 547 F.2d 1291, 1296 (5th Cir. 1977). It is *the making of the untrue statement* that is unlawful, "not the occurrence of a dollar loss as a result of the actions, statements, or omissions." *Id.* Put another way, "a violation of the Securities Act is [not] a result-oriented crime." *Cook v. State*, 824 S.W.2d 634, 638 (Tex. App.—Dallas 1991), *pet. ref'd*, 828 S.W.2d 11 (Tex. Crim. App. 1992) (per curiam). At least for *government* enforcement, securities laws protect the integrity of the markets—they do not just target actual financial losses caused by a *lack* of integrity.

Likewise, the State legitimately demands that the Medicaid-reimbursement system be one of integrity. The statute does not just target general government "fraud"—it requires compliance with *specific*

anti-fraud and fraud-*prevention* requirements.[10]  Remarkably, however, intentional lies to the government that are material to its management of a massive and expensive program turn out to be of no great importance to the Court, which holds that § 36.002(8) was designed *only* to target those who ultimately receive more money than they would have received if they had told the truth.  (And even this standard seems insufficient to support the Court's judgment, because at least *some* of the false information supplied on the forms was apparently written to obtain money more *quickly* than would have been possible if the correct information had been supplied—for example, when the actual providers did not yet even have an identification number.)

\*   \*   \*

Remember that all of this comes just because of the Court's root canal of the word "and."  The foregoing reasons explain why, as a matter

---

[10] But suppose "fraud" as generally defined is the only thing that matters. As the Court notes, the Government Code defines fraud as "an intentional deception or misrepresentation made by a person with the knowledge that the deception *could* result in some unauthorized benefit to that person or some other person." Tex. Gov't Code § 531.1011(4) (emphasis added).  So even if it were just standard government "fraud" at issue, the general definition still clearly contemplates that *some frauds* will not ultimately "result in some unauthorized benefit." *Id.*  The punishable act is not the realization of an unauthorized benefit, but the "intentional deception or misrepresentation." *Id.*

After all, unlike private plaintiffs, the government does not need to establish an actionable injury to bring an enforcement action; the violation of law is itself sufficient. *See, e.g.*, *Universal Brands, Inc. v. Philip Morris Inc.*, 546 F.2d 30, 34 (5th Cir. 1977) ("A mere showing by the private plaintiff of a violation of the anti-trust laws has no actionable significance because, while in a government action there need be established only an antitrust violation, a private litigant 'must not only show the violation of the antitrust laws, but show also the impact of the violations upon him.'" (internal quotation mark omitted) (quoting *Credit Bureau Reps., Inc. v. Retail Credit Co.*, 476 F.2d 989, 992 (5th Cir. 1973))).

of statutory construction, it is wrong for the Court to have interpreted the word as it did.

That my reading of the statute aligns with the State's does not mean that I think the statute cannot be abused. Maybe it was abused here. Dr. Malouf's strongest point is not his argument that the statute does not even really care about knowing the "actual" provider. Nor is it his contention that the lies he told on 1,842 false claim forms did not really harm the State. His strongest point is instead that *because* all the procedures would have been authorized and paid for, the State is using the law as a sledgehammer against a gnat. Really, the State seeks *$16 million* for a bunch of forms that were all wrongly filled out in exactly the same way, none of which was used to actually rob the treasury of even $1 that should not have been paid? I hasten to add that I know nothing of the underlying investigation or negotiations, but it *seems* excessive.

The Court's solution is every bit as excessive. The meaning of "and" cannot turn on a collateral matter like whether the total penalty for these false claims was $1,000 or $16 million. The words of a statute mean what they mean. Giving this statute an excessively parsimonious reading does not fix enforcement proceedings that are excessively grasping. The law has other and better ways to solve that sort of problem—assuming it is one here—without rewriting a statute. Being over-penalized raises potential claims under our due-course clause or, perhaps most clearly, under the provision of our Constitution promising that "[e]xcessive bail shall not be required, *nor excessive fines imposed*, nor cruel or unusual punishment inflicted." Tex. Const. art. I, § 13 (emphasis added).

Dr. Malouf, however, has not invoked these constitutional

protections. The Court should not find a backdoor way to give him aid or comfort when he refuses to knock at the front door.[11]

One might also argue that the State's construction harshly penalizes claimants who *inadvertently* provide the wrong license type or identification number via "unintentional technical, clerical, or administrative errors." Tex. Gov't Code § 531.1011(4) (excluding such "errors" from the definition of fraud). But the statute covers that possibility, too—it only punishes claimants who "knowingly" make claims without the required information. Tex. Hum. Res. Code § 36.002(8). In other words, the legislature included a *mens rea* element to prevent penalizing mere negligence—and remember, this is Dr. Malouf's *lead* argument, for which he requests a remand.[12] But any desire to hold the

---

[11] I take no position on the merits of any such contention, although I am quite open to them *if* over-penalizing is shown. My only point is if anything is wrong with the State's case it is *not* its interpretation of the word "and."

[12] The Court declines to resolve Dr. Malouf's lead argument because it rules for him on his alternative argument. *See ante* at 14 n.13. But because I reject that argument, I must resolve whether summary judgment for the State was improper with respect to whether Dr. Malouf *knowingly* failed to provide his identification number and license type.

I would mostly affirm on this ground, too. Dr. Malouf testified that he generally did not know that his clinic was providing false information. This testimony is probably enough to create a fact issue as to Dr. Malouf's mental state—*i.e.*, whether he genuinely did not know that his clinic was filing false claim forms. As to others, he testified that he *knew* his clinic was providing the wrong identification number, but thought that it was doing so based on prior approval from Texas Medicaid. In other words, Dr. Malouf *admits* to knowingly making false claims—he just thought that his conduct was excused. The statute, however, does not require "specific intent to commit an unlawful act under Section 36.002 . . . to show that a person acted 'knowingly.'" Tex. Hum. Res. Code § 36.0011(b). Put another way, the statute does not excuse telling lies in good faith, so even if we credit Dr. Malouf's testimony that he thought it was

30

State to its burden of proof has *nothing* to do with reading the statute to not require the specified information in the first place.

The legislature struck a careful balance between two competing objectives: enacting strong protections against fraud while simultaneously excluding honest mistakes from the statute's reach. The Court's approach disrupts that balance, departing from the fundamental principle that courts "enforce a statute as written, and avoid construing individual provisions of a statute in isolation from the statute as a whole." *Hlavinka v. HSC Pipeline P'ship, LLC*, 650 S.W.3d 483, 491 (Tex. 2022) (internal quotation marks omitted).

## D

The Court also indulges in substantial dicta concerning the rule of lenity—dicta because, amazingly, the Court holds that the *only* reasonable interpretation of the statute is the one that I have shown to be utterly unreasonable, *ante* at 33, and with only one reasonable interpretation, there is no work for the rule of lenity to perform. I would not apply the rule of lenity either—because the only reasonable reading reaches the result contrary to the Court's. But if the Court insists on addressing the rule of lenity, it should at least do so accurately. It is

---

fine to falsely report that he was the provider, he still *knowingly did it*.

With respect to the first batch of claim forms (those where Dr. Malouf allegedly did not know that his clinic was filing false claim forms), therefore, I would reverse and remand for the trial court to determine which (if any) forms qualify for the first batch and, as to those forms, let a factfinder evaluate the credibility of Dr. Malouf's general denial. As to the second batch of claim forms (those where Dr. Malouf knowingly lied but believed he had the right to do so), I would affirm the judgment below that renders judgment for the State. I disagree with the Court as to both batches, and thus must dissent in the entirety of the judgment.

fortunate that all that discussion, *see ante* at 7–13, 33, is dicta.[13]

The Court is mostly right in stating that, in cases of ambiguity, the rule of lenity requires courts to construe penal statutes narrowly and in favor of the accused. I also agree that the rule of lenity is not relevant absent ambiguity. But not just *any* ambiguity will do; after all, "most statutes are ambiguous to some degree." *Muscarello v. United States*, 524 U.S. 125, 138 (1998).

To the contrary, courts across the country, including this Court, apply the rule of lenity only in extreme cases. The U.S. Supreme "Court has repeatedly emphasized that a court must find not just ambiguity but 'grievous ambiguity' before resorting to the rule of lenity." *Shular v. United States*, 589 U.S. 154, 167 (2020) (Kavanaugh, J., concurring). In other words, "the rule of lenity only applies if, after considering text, structure, history, and purpose, there remains a *grievous ambiguity* or uncertainty in the statute . . . such that the Court must simply guess as to what [the legislature] intended." *Barber v. Thomas*, 560 U.S. 474, 488 (2010) (emphasis added) (internal quotation marks omitted). We have likewise said that the rule applies only when there is "*grave doubt* as to the intention of the legislature." *Gulf, Colo. & Santa Fe Ry. Co. v. Dwyer*,

---

[13] The Court starts by opining at great length on the rule of lenity, then agrees that the rule of lenity does not apply unless a statute is ambiguous, then deems this statute unambiguous, and thus concludes that the rule of lenity does not apply. *Pulsifer* reflects the sounder approach—to address lenity only at the *end*, and—if the statute is unambiguous—to decline further consideration of the rule of lenity for that reason, without any extraneous discursions into that doctrine. *See* 144 S. Ct. at 737 ("The two possible readings thus reduce to one—leaving no role for lenity to play."). The Court's contrary approach is akin to a lengthy discourse on the proper headwear for the rain, and only then looking out the window and seeing the sun.

19 S.W. 470, 471 (Tex. 1892) (emphasis added).[14]  The Court of Criminal Appeals applies the rule of lenity "when the proper construction of a statute is in *insoluble doubt*." *Diruzzo v. State*, 581 S.W.3d 788, 802 n.22 (Tex. Crim. App. 2019) (emphasis added); *see also Cuellar v. State*, 70 S.W.3d 815, 819 n.6 (Tex. Crim. App. 2002) (noting that it is constitutionally permissible to consider the rule of lenity only when absolutely necessary to resolve statutory ambiguity).  The Fifth Circuit takes the same approach: "The rule of lenity . . . should be reserved for those situations in which a reasonable doubt persists about a statute's intended scope even *after* resort to the language and structure, legislative history, and motivating policies of the statute." *United States v. Orellana*,

---

[14] Contrary to the Court's accusation that this quote reflects "[c]herry-picking one of our oldest decisions on the topic," *ante* at 10 n.11, this Court has *never* suggested that we apply the rule of lenity before first applying traditional methods of interpretation to resolve superficial doubts about the meaning of statutory terms.  The Court's own citations (which seem to have no great concern with "old[] decisions") prove the point.  In *Estes v. State*, for example, the Court observed that "if doubt existed as to the intention of the legislature in the two preceding sections" of the statute in question, "that doubt [was] removed by considering them with [another section] which, in prescribing what shall be a sufficient indictment for the offense," revealed the legislature's intention "beyond a doubt."  10 Tex. 300, 309 (1853).  We then reiterated that "the intention of the legislature is manifest by considering the several provisions of the law in their natural connection as reflecting their meaning one upon the other," thus placing "the proper construction of the statute . . . beyond a question by the application of [the rule of lenity]." *Id.*

"Cherry-pick[ed]" or otherwise, it is hardly an incorrect statement of Texas law.  Unsurprisingly, this Court runs a bit low on cases specifically addressing what level of ambiguity is required to justify applying the rule of lenity—we construe penal statutes quite infrequently compared to other courts.  Those that do regularly construe such statutes, however, apply the rule of lenity only in cases of *grave* ambiguity.  I would not purport to chart a different course—and especially not in a case where the Court itself admits that the rule of lenity plays no role *regardless* of the level of ambiguity at issue.

405 F.3d 360, 371 (5th Cir. 2005) (internal quotation marks omitted).

Words like "grave," "grievous," and "insoluble"—repeated in case after case, court after court, century after century—do some real work. The rule of lenity is not a special gift to one side of the case—a sort of strict-scrutiny of penal-law construction. It is a "break glass in case of ambiguity," an absolute last resort when nothing else helps—not context, not the canons, not history and tradition, not statutory history. The rule of lenity means that if it would *truly* be a coin flip, we do not flip the coin but instead give the call to the defendant.

But even if there were *some* ambiguity here, it is not remotely a "grave," "grievous," or "insoluble" ambiguity that escapes meaning. No coin-flipping needed. To the contrary, the text, structure, and purpose of this statute resolve the question. I hope that the lower courts do not draw from the Court's dicta today that the rule of lenity is suddenly a vibrant force ready to slay statutory requirements that are otherwise clear.

\* \* \*

"[T]extualists believe that meaning is a function of the way speakers use language in particular circumstances." John F. Manning, *The Absurdity Doctrine*, 116 Harv. L. Rev. 2387, 2457 (2003). Courts must construe statutes with the knowledge that "words mean what they conveyed to reasonable people at the time they were written." Scalia & Garner, *supra*, at 16. So "it is a 'fundamental principle of statutory construction (and, indeed, of language itself) that the meaning of a word cannot be determined in isolation, but must be drawn from the context in which it is used.'" *Yates v. United States*, 574 U.S. 528, 537 (2015) (quoting *Deal v. United States*, 508 U.S. 129, 132 (1993)). This includes statutory context and purpose, the latter of which "must be derived from the text,

34

not from extrinsic sources such as legislative history or an assumption about the legal drafter's desires." Scalia & Garner, *supra*, at 56.

The Court does not follow these principles today. Its "textualism" ignores the statutory context and expressed purposes underlying the Medicaid Fraud Prevention Act's language. The rule of lenity has no role to play here, both because the statute is *not* ambiguous and because, even if it were, it would not be triggered as a first impulse.

But if the Court is right and I am wrong, then buckle up. As I show next, if *this* statute means what the Court says, then a huge host of statutes do *not* mean what anyone has thought they meant.

## II

The foregoing reasons are sufficient in and of themselves to merit my dissent. But the Court's approach to statutory construction is also problematic because of multiple Texas and federal laws that use the terms "and" and "or" interchangeably.[15] I mention those statutes for two

---

[15] As noted above, *see supra* at 5–6 & n.2, it is not just *statutes* that use "and" and "or" interchangeably. English speakers in non-legal *and* legal contexts have used one word when the other would not meaningfully change the phrase's meaning or when the other word would seem better.

> To thee and thine hereditary ever
> Remain this ample third of our fair kingdom;
> No less in space, validity, *and* pleasure,
> Than that conferr'd on Goneril.

William Shakespeare, *King Lear* act 1, sc. 1, l. 88–91 (emphasis added).

The Texas Pattern Jury Charges also use "and" when "or" could do. For example, in deciding whether a nuisance is temporary, a jury must determine if the injury is "such that any anticipated recurrence would be only occasional, irregular, intermittent, *and* not reasonably predictable." Comm. on Pattern Jury Charges, State Bar of Tex., *Texas Pattern Jury Charges: General Negligence, Intentional Personal Torts & Workers' Compensation* PJC 12.4

35

reasons. First, their mere existence proves the point that I have made above—that these conjunctions are often used in such a transposable way. Statutes must therefore be read within their context, which always "includes common sense." *Morath v. Lampasas Indep. Sch. Dist.*, 686 S.W.3d 725, 738 (Tex. 2024) (quoting *Biden v. Nebraska*, 143 S. Ct. 2355, 2379 (2023) (Barrett, J., concurring)). Second, these statutes' existence amplifies the threat of today's decision—if *this* statute can be treated as the Court does, what is next? I hope, instead, that today is a one-off, and that the Court returns to the older tradition of relying on text within context, "includ[ing] common sense."

I start with just a few Texas statutes (and mention quite a few others—but still just the tip of the iceberg—in footnote 16, *infra*). Chapter 2 of the Texas Family Code generally forbids county clerks from issuing marriage licenses "if either applicant . . . fails to submit proof of age *and* identity." § 2.009(a). Applying today's logic, a county clerk

---

(2022) (emphasis added). Under the Court's reasoning today, a temporary nuisance must be all of those adjectives, even though all need not be found. *See Schneider Nat. Carriers, Inc. v. Bates*, 147 S.W.3d 264, 272 (Tex. 2004) (holding that a nuisance is "temporary if it is 'occasional, intermittent *or* recurrent'" (emphasis added) (quoting *Bayouth v. Lion Oil Co.*, 671 S.W.2d 867, 868 (Tex. 1984))); *see also Huynh v. Blanchard*, ___ S.W.3d ___, 2024 WL 2869423, *18 (Tex. June 7, 2024) (noting a jury's finding that a "nuisance [was] 'occasional, irregular, [and] intermittent'").

Our very own rules of procedure use "and" when context (and this Court's routine practice) shows that it means "or." *See* Tex. R. App. P. 52.8(a) (requiring an appellate court to deny relief "[i]f the court determines from the petition *and* any response *and* reply that the relator is not entitled to the relief sought" (emphasis added)). Under the Court's reasoning, Rule 52.8(a) would not permit this Court to deny relief until it considered the petition, the response, *and* the reply. But in practice, this Court *routinely* denies relief without seeing a response *or* a reply to the petition for review. Today, the Court holds the legislature to a higher standard than the one to which we hold ourselves.

could issue a marriage license if an applicant submitted proof of identity but not age (or vice versa), even though the statute requires applicants to submit *both* pieces of information (sound familiar?). *Id.* § 2.002(2) (requiring applicants to submit "proof of identity *and* age" in their application for a marriage license (emphasis added)).

Chapter 312 of the Texas Health and Safety Code applies to agreements with a "medical and dental unit." § 312.003. Under the Court's reasoning, Chapter 312 would only apply to agreements with a unit that provided both medical *and* dental services, even though the statute is clearly intended to apply to agreements with medical *or* dental units. *See* Tex. Educ. Code § 61.003(5) (specifying that the term "[m]edical and dental unit" includes both medical and dental schools).

Consider also Chapter 65 of the Texas Parks and Wildlife Code, which "governs the taking, possession, *and* sale of alligators." § 65.002 (emphasis added). Under the Court's approach, that chapter would punish someone who took, possessed, and sold an alligator—but one who took, possessed, and *gifted* an alligator would be beyond the statute's reach. Yet viewed in context, the Code contemplates regulating all three activities, *independent* of the others—it permits the Parks and Wildlife Commission to regulate the "limits, size, means, methods, and places in which it is lawful to take *or* possess alligators," among other things. *Id.* § 65.003(4) (emphasis added).[16]

---

[16] Besides those discussed in this part of my opinion, many other Texas statutes contain similar grammatical ambiguities. Here is but a sample: Tex. Fin. Code § 152.107(f) (providing that a money services licensee loses its license if it "fails to submit the completed annual report *and* pay the annual license fee and any late fee due within the time prescribed by [the statute]"

Federal law is no different. For example, 49 U.S.C. § 28301(b) provides that the preceding section "does not apply to . . . (A) an independently owned and operated railroad not exceeding one hundred miles in length; (B) an electric street railroad; *and* (C) an electric interurban railroad." Read in context, the Code does *not* require a railroad to satisfy (A), (B), *and* (C) to be exempted; rather, all three kinds of railroads are exempt. The Court's reasoning would rationalize the

(emphasis added)); *id.* § 392.304(a)(6) (providing that a debt collector may not use "a written communication that fails to indicate clearly the name of the debt collector *and* the debt collector's street address or post office box *and* telephone number if the written notice refers to a delinquent consumer debt" (emphasis added)); Tex. Lab. Code § 205.016 (providing certain penalties for a reimbursing employer "who fails to pay a reimbursement on the date on which the reimbursement is due, or who fails to submit records *and* reports, as prescribed by the commission" (emphasis added)); Tex. Loc. Gov't Code § 83.004(a) (permitting a county judge to declare the office of county treasurer vacant "[i]f a person elected to the office . . . fails to provide an adequate bond as required by [statute] *and* to take the official oath on or before assuming the office (emphasis added)); Tex. Occ. Code § 651.460(a) (providing that "[a] person violates this chapter if the person . . . (2) fails to retain and make available to the commission, on request, copies of all price lists, written notices, embalming documents, *and* memoranda of agreement required by this chapter" (emphasis added)); Tex. Parks & Wild. Code § 12.603 (providing that the Parks and Wildlife Department can refuse to issue permits to applicants who "fail[] to submit . . . (1) a completed application . . . (2) the required permit fee; (3) accurate reports as applicable; *and* (4) any additional information that the department determines is necessary to process the application" (emphasis added)); Tex. Penal Code § 21.09(2) (providing that a person commits an offense if he or she knowingly "fondles or touches the anus or genitals of an animal in a manner that is not a generally accepted *and* otherwise lawful animal husbandry or veterinary practice, including touching through clothing" (emphasis added)); Tex. Tax Code § 181.001(a) (imposing a tax on one who "(1) manufactures or produces cement in, *or* imports cement into, the state; *and* (2) distributes or sells the cement in intrastate commerce *or* uses the cement in the state" (emphasis added)).

38

opposite result.[17]

The Court also departs from the reasoning used by courts around the country. Just this term, the U.S. Supreme Court noted that courts should resolve ambiguity "by reviewing text in context." *Pulsifer*, 144 S. Ct. at 726. The Court rejected Pulsifer's interpretation not because it was grammatically impermissible, but because it would "make[] a hash of the scheme Congress devised." *Id.* at 735. Or, as this Court recently described *Pulsifer*, "requiring A, B, and C, each, provides a safety valve for otherwise stricter sentences, while requiring only one or two of the three would allow more violent criminals to be released sooner and seriously rupture the sentencing system." *Bd. of Regents of Univ. of Tex. Sys. v. IDEXX Labs., Inc*, ___ S.W.3d ___, 2024 WL 2983170, \*5 (Tex. June 14, 2024). Yet here, the Court embraces a construction that ruptures the statutory scheme by insisting on a dubious definition of "and" even though only the State's interpretation is consistent with the statutory protection against Medicaid fraud. It is hard to read these two opinions from our Court issued one week apart and make sense of them both.

Likewise, state supreme courts across the country refer to statutory context and common sense when giving meaning to conjunctions. *See People v. Allen*, 968 N.W.2d 532, 538 n.16 (Mich. 2021) (holding that "the context mandates a disjunctive reading of 'and'" because a conjunctive construction would have created a result inconsistent with the rest of the statutory scheme); *State v. Irby*, 967

---

[17] For further federal examples of statutes that disprove (and would be threatened by) the Court's reasoning, see the Solicitor General's *Pulsifer* briefing. She includes dozens. *Pulsifer* itself quoted 34 U.S.C. § 20101(f) as an example. *See* 144 S. Ct. at 728.

N.W.2d 389, 395 (Minn. 2021) ("in limited circumstances, 'and' can be read in a several, that is, disjunctive, sense based on context and the specific way the word is used"). We should too.

\* \* \*

The legislature can fix the specific error the Court makes today. It could amend the statute to use different language to affirmatively and expressly require *both* the license type *and* the identification number (or whatever else it may want). But how can the legislature solve the larger problem that the Court has created—a problem, as the foregoing discussion reflects, that permeates every part of our statutory law? If the judiciary is now going to read laws that are as clear in their scope as this one to mean something quite different than what they say, the legislature will not only have to scrub all *new* legislation, but will also have to race to check all the existing laws. Perhaps a review of legislation is no terrible thing—but to force the legislature to go on Conjunction Patrol at the cost of other legislative priorities seems to be a questionable way to treat a coordinate branch.

Because I disagree with the Court's articulation of the law and its result—a conjunction I use with meaning—I must respectfully dissent.

Evan A. Young
Justice

**OPINION FILED:** June 21, 2024

40